**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| Insurance Products Marketing,<br>Inc., Donald R. Feldman, and<br>Feldman Insurance Consultants,<br><br>Plaintiffs,<br><br>v.<br><br>Conseco Life Insurance Company,<br>Conseco Senior Health Insurance<br>Company, Conseco Health Insurance<br>Company, Conseco Annuity Assurance<br>Company, Conseco Marketing, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 9:11-cv-01269-PMD<br><br>**ORDER** |

This matter is before the Court upon Defendants' Motion for Summary Judgment as to Plaintiffs' claims for (1) Breach of Contract and (2) Misappropriation—Common Law/Invasion of Privacy. For the reasons set forth below, the Court denies Defendants' Motion for Summary Judgment.

**PROCEDURAL HISTORY/FACTUAL BACKGROUND**

On April 18, 2011, Plaintiffs filed this action against Defendants in the Court of Common Pleas for Beaufort County, South Carolina. The complaint alleged claims for (1) violations of the Lanham Act, 15 U.S.C. §§ 1501 et seq.; (2) Misappropriation—Common Law/Invasion of Privacy; (3) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code § 39-5-10 et seq.; and (4) Breach of Contract—Settlement Agreement. On May 25, 2011, Defendants filed their Notice of Removal. On June 1, 2011, Defendants filed their Motion to Dismiss and Memorandum in Support of the Motion to Dismiss. After receiving an extension of time to file a response, Plaintiffs filed their Response in Opposition to Defendants' Motion to

Dismiss on June 24, 2011. Also on that day, Plaintiffs filed a Motion to Amend the complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. This Court entered an Order on August 29, 2010 that granted Defendants' Motion to Dismiss as to the Lanham Act claim and Unfair Trade Practices claim, but denied Defendants' motion as to the Breach of Contract claim and Misappropriation claim. Further, Plaintiffs were granted leave to file an amended complaint regarding their two remaining claims, which was filed on September 2, 2011. Defendants filed an Answer on September 16, 2011 denying all allegations and asserting numerous defenses. Defendants then filed a Motion for Summary Judgment on May 29, 2012, and Plaintiffs filed their Response in Opposition on June 22, 2012. On July 16, 2012, Defendants filed a Motion to Strike Affidavit of Erik Bugge, and Plaintiffs filed their Response in Opposition on July 20, 2012.

The parties to this action were involved in a previous lawsuit in this Court, Civil Action No. 9:04-22261-23, wherein Plaintiffs sought damages for (1) breach of contract accompanied by a fraudulent act; (2) wrongful termination; (3) tortious interference with a contractual relationship; (4) violation of the South Carolina Unfair Trade Practices Act; (5) civil conspiracy; (6) conversion; (7) unjust enrichment; and (8) reparative injunction. On September 18, 2006, the parties entered into a Confidential Settlement and Release Agreement ("the Agreement") that resolved the matter. Plaintiffs allege that Defendants have failed to honor and perform several specific requirements of the Agreement reached in the previous litigation. Plaintiffs also allege that in the years subsequent to the settlement of the previous lawsuit, Defendants sent written correspondence to their policyholders whereby Defendants represented that Plaintiffs continued to serve as agents for the Defendants. Plaintiffs state that Defendants have profited from the use

of Plaintiffs' names in their correspondence to policyholders, which has resulted in lost profits for Plaintiffs. Defendants deny these allegations.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown by citing to the record "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presents a genuine issue of material fact if a "reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The moving party bears the burden of proving that there are no facts from which a jury could draw inferences favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Id.* Summary judgment should only be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material facts and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Tr. of Maryland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir.1992).

## ANALYSIS

### A.    PLAINTIFFS' BREACH OF CONTRACT CLAIM

The 2006 Agreement is the contract at issue in this case. The terms of the Agreement are interpreted under the contract law of Indiana. "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993). Pursuant to paragraphs 6(g) and 6(h) of

the Agreement, Defendants agreed to send letters[1] to two Insurance Commissioners and multiple state departments of insurance ("DOI") for the purpose of informing these entities that Donald Feldman was not terminated for cause by Defendants. Plaintiffs allege that those conditions have not been met, in large part, because Defendants failed to send the letter(s) to *all* required parties. "At common law, under general contract principles, the slightest breach of the contract, no matter how trivial or unintended, may be the basis for an action for breach of contract." *Fowler*, 612 N.E.2d at 601; *see also Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 980 (Ind. 1993). Indiana courts have relied on the following factors as outlined in Restatement (second) of Contracts § 241 (1981) for determining whether a breach by a party can constitute a material breach:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

---

[1] The following letter was to be sent to the National Association of Insurance Commissioners ("NAIC"), the Midwest Zone of the National Association of Insurance Commissioners, the Kansas DOI, the New Hampshire DOI, the South Carolina DOI, and the Texas DOI:

> This letter is to notify you that Donald Feldman's (National Producer Numbers 238957 and 295540, social security Number 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, NAIC Number 85900) termination with the Conseco Companies is hereby modified to reflect that Feldman is hereby terminated by the Conseco Companies pursuant to the terms of his contract as opposed to "for cause."

Agr. at 6(g). The exact same letter was to be sent to the Arkansas DOI, the North Carolina DOI, the North Dakota DOI, the Ohio DOI, the Oregon DOI, and the Tennessee DOI, with the following additional sentence at the end: "The Conseco Companies further retract the reason stated for the "for cause" termination (i.e. "rolling business")." Agr. at 6(h).

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Churchwell v. Coller & Stoner Bldg. Co.*, 385 N.E.2d 492, 495 (Ind. Ct. App. 1979); *Canada Dry Corp. v. Nehi Bev. Co.*, *Inc. of Indianapolis*, 723 F.2d 512, 517 (7th Cir. 1983).

The Agreement specifically provides that "all provisions . . . are deemed to be material unless designated otherwise." Agr. at 7(k). Because the Agreement does not provide otherwise, provisions 6(g) and 6(h) are material. The record shows that Defendants mailed all the required letters pursuant to provision 6(h). *See* Defs.' Mot. Summ J., Exh. B. However, there is no evidence of, nor do Defendants address in their motion, whether or not they sent the required letter to the National Association of Insurance Commissioners or the Midwest Zone of the National Association of Insurance Commissioners as required by provision 6(g). Within that provision, Defendants agreed to mail a letter to these entities, which are arguably the most important entities from the standpoint of a terminated insurance agent, to receive notice that termination was *not* "for cause." Therefore, there is a genuine issue of material fact as to whether Defendants failed to fulfill all of the requirements of provision 6(g), and whether such a failure constitutes a material breach of the Agreement. *See Captain & Co.*, *Inc. v. Stenberg*, 505 N.E.2d 88, 92 (Ind. Ct. App. 1987) ("[T]he question of whether a contract has been breached is ordinarily a question of fact, and is for the jury to decide.); *Canada Dry Corp.*, 723 F.2d at 517 ("The materiality of a contractual breach is a question of fact reserved for the jury.").

Pursuant to provision 7(k) of the Agreement, "The parties agree that upon the material breach of any provision of this Agreement, the breaching party shall pay to the non-breaching

party $50,000.00 in liquidated damages." Defendants argue that the liquidated damages provision would operate as a penalty because Plaintiffs did not incur any actual damages; therefore, there is no correlation between the liquidated damages and actual damages. Defendants rely on Donald Feldman's deposition testimony where he stated that Plaintiffs have not had any application to contract with another insurance company denied since September 18, 2006 nor have Plaintiffs been the subject of any insurance department investigation or inquiry since September 18, 2006. Feldman Depo 96:12-16; 96:20-97:3. Further, he stated that being terminated for cause has not come up at all since 2005. *Id.* at 73:14-16. Based on this testimony, Defendants argue that Plaintiffs could not have possibly suffered any damages flowing from their purported failure to notify certain departments of insurance.

The question of whether a provision is unenforceable as a penalty or as damages is a question of law solely for the court to resolve. *See A.V. Consultants, Inc. v. Barnes,* 978 F.2d 996, 1001 (7th Cir. 1992) (applying Indiana law). Under Indiana law, liquidated "damages are to be evaluated as of the time of the making of the contract and are deemed unreasonable 'when they are "grossly disproportionate to the loss which may result from breach" or unconscionably in excess of loss sought to be averted.'" *Miami Valley Contractors, Inc. v Town of Sunman, Ind.*, 960 F. Supp. 1366, 1375 (S.D. Ind. 1997) (citing *A.V. Consultants, Inc.*, 978 F.2d at 1001 (quoting *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 283 (Ind. 1983))). "Liquidated damages are an appropriate remedy and will be enforced where 'actual damages are uncertain or difficult to ascertain or prove or are of a purely speculative character and the contract furnishes no data for their ascertainment.'" *Id.* (citing *A.V. Consultants, Inc.*, 978 F.2d at 1001). When determining whether the clause is valid, "examine the facts, the parties' intentions, and the reasonableness of the stipulation under the circumstances of the case." *Hahn v. Drees, Perugini*

& Co., 581 N.E.2d 457, 463 (Ind. Ct. App. 1991); *see also Rajski v. Tezich,* 514 N.E.2d 347, 349 (Ind. Ct. App. 1987) (noting that "reasonableness is the touchstone" for determining whether liquidated damages clause is enforceable). Notably, back in 2006, it was Defendants who presented the Agreement to Plaintiffs containing a liquidated damages clause with a fixed sum of $50,000.00. Plaintiffs argue that by presenting the clause to them, Defendants consented to the amount and believed it to be reasonable. The clause is not in any way unclear or ambiguous— upon the material breach by either party, $50,000.00 is owed to the non-breaching party. The parties signed the Agreement fully aware and in agreement that provision 7(k) would operate as a liquidated damages provision. *See Delgado v. Boyles*, 922 N.E.2d 1267 (Ind. Ct. App. 2010) (noting that to determine the intent of the parties at the time the contract was made, the court examines the language used to express their rights and duties). Several provisions of the Agreement were aimed at ensuring that the parties' reputations would be restored and further protected. Thus, at the time of entering the Agreement, the parties had to place a dollar amount on what they believed their damages to be in the event that their business reputations were not restored, but were further damaged. The Court finds that such a determination would be difficult, if not impossible, which is likely why the Agreement furnishes no data for their ascertainment. The damages flowing from such an injury are necessarily hard to evaluate and are a proper subject for a liquidated damages clause. *See Yockey v. Horn*, 880 F.2d 945, 953 (7th Cir. 1989) (finding that plaintiff's business reputation might have been significantly damaged in the eyes of others upon breach and damages from such an injury would be "difficult to evaluate and would be a proper subject for a liquidated damages clause," so long as the amount is reasonable). Defendants were obviously concerned with having to prove their damages in the event of Plaintiffs' material breach because they drafted the Agreement specifically providing for a

liquidated damages clause. *See Miami Valley Contractors, Inc.*, 960 F. Supp. at 1375 (stating that "there are no hard and fast guidelines" . . . "determination of enforceability turns on the balance of the particular equities of the case").

Further, there is no indication of bad faith by the parties in setting $50,000.00 as the amount of liquidated damages to be paid upon a material breach at the time they entered into the Agreement. *See Czeck v. Van Helsland*, 241 N.E.2d 272, 275 (Ind. Ct. App. 1968) ("In some cases, we will look more favorably at a liquidation provision . . . where it appears from all the evidence that a good faith effort was made by both parties to determine a reasonable amount of liquidated damages, when the actual amount was difficult or impossible of ascertainment at the time of the execution of the agreement."). The agreed upon amount is one third the total amount ($150,000.00) paid by Defendants to settle the lawsuit, which suggests that it is a reasonable sum to be paid in the event of a material breach. *See Skendzel v. Marshall*, 301 N.E.2d 641, 645-46 (Ind. 1973) (holding invalid as a penalty a land contract vendees' forfeiture of $21,000.00, "well over one-half the original contract price"). Additionally, the liquidated damages clause as stated in provision 7(k) does not preserve or provide for other remedies; only under the "confidentiality" section of the Agreement and upon material breach therein, which is not the type of breach at issue here, are other remedies allowed, plus liquidated damages.[2]  *See Olcott Intern. & Co., Inc.*, 793 N.E.2d at 1077 ("Where a contract allows a party to pursue liquidated damages *and* other legal and equitable remedies, the purported liquidated damages clause serves a penalty and not an estimation of actual damages.") (emphasis in original). Defendants cite to

_____

[2] In the "confidentiality" section it states that "the Plaintiffs, Defendants and all counsel of record further agree that if the non-breaching party proves a breach of the confidentiality provision, including any subpart, the breaching party will be required to pay the non-breaching party's reasonable attorneys' fees and litigation costs associated with the enforcement of this provision, plus $50,000 in liquidated damages as set forth above." Agr. 10(6)(b).

*Wildwood Industries, Inc. v. Genuine Machine Design, Inc.*, 587 F.Supp.2d 1035 (N.D. Ind. 2008), an Indiana District Court case that itself relies on *Harbours Condominium Association v. Hudson*, where the Court of Appeals of Indiana held—after acknowledging some contradiction[3] within the rules on liquidated damages—that "a party who seeks to enforce a liquidated damages clause need not prove actual damages, but may be required to show a correlation between the liquidated damages and actual damages in order to assure that a sum charged may fairly be attributed to the breach." *Harbours Condo. Ass'n v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006). Notably, in both the above cited cases, it was at a trial where the burden was placed upon the party seeking to enforce the liquidated damages clause to demonstrate some proportionality between the loss and the sum stated in the clause. Here, the burden is on Defendants as the party seeking summary judgment to negate the existence of any genuine issue of material fact. Further, all the facts and reasonable inferences drawn from the facts are construed in favor of the Plaintiffs. Defendants rely mainly on Feldman's testimony to support their position that the liquidated damages clause is a penalty because it is "grossly disproportionate" to Plaintiffs' actual damages. Although Feldman's deposition testimony indicates that he has not suffered the harm likely to flow from Defendants' breach, the Court cannot agree with Defendants that he has therefore suffered no damages at all flowing from Defendants' alleged breach. It would be difficult for Feldman to articulate what damages Plaintiffs have possibly suffered from 2006 to the present if the National Association of Insurance Commissioners ("NAIC") and the Midwest Zone of the National Association of Insurance Commissioners were, and still are, unaware that

---

[3] Specifically, that one rule states: "[T]o show that the sum stipulated in an agreement as liquidated damages is not 'grossly disproportionate' to the loss, the party seeking to enforce [it] must demonstrate some proportionality between the loss and the sum established as liquidated damages. Yet, a 'typical liquidated damages provision provides for the forfeiture of a stated sum of money without proof of damages.'" *Harbours Condo. Ass'n v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006) (internal citations omitted).

his termination was not for cause.  *See Raymundo v. Hammond Clinic Ass'n.*, 449 N.E.2d 276, 284 (Ind. 1983) (holding valid liquidated damages payment largely because of the uncertainty in determining the amount of actual damages).  Under the circumstances of this case, the Court finds that Defendants have failed to establish that there is no genuine issue of material fact that the $50,000.00 sum is as a matter of law unreasonable. The evidence establishes that the parties intended to be bound by and mutually agreed to a liquidated damages clause, that the parties' damages were uncertain or difficult to ascertain at the time of entering into the agreement, and that $50,000.000 would be a reasonable sum for the breaching party to pay in lieu of performance in light of the potential and unascertainable damages that could have resulted in the event of a material breach.  Therefore, the liquidated damages provision is enforceable and Defendants' Motion for Summary Judgment on this basis is denied.

## B.    PLAINTIFFS' MISAPPROPRIATION CLAIM

Plaintiffs claim that Defendants have intentionally and continually—since the Agreement and to this very day—used the identity, likeness, and trade name of Plaintiffs in correspondence, specifically annual policy statements and lapse/grace notices, sent to numerous policyholders in multiple states. On the correspondence, either Insurance Products Marketing, Inc. ("IPM") or Feldman Insurance Consultants ("FIC")[4] is named as the agent for the policy, despite the fact that Plaintiffs severed their agent status with Defendants upon entering the Agreement. South Carolina law recognizes three separate and distinct causes of action for invasion of privacy: (1) wrongful appropriation of personality; (2) wrongful publicizing of private affairs; and (3) wrongful intrusion into private affairs.  *See Gignilliat v. Gignilliat, Savitz & Bettis, LLP*, 684 S.E.2d 756, 759 (S.C. 2009).   To state a claim for wrongful appropriation of personality, a

---

[4] Donald Feldman is the corporate representative for both entities. FIC does not exist anymore, but IPM is an active and authorized corporation that is registered in South Carolina.

plaintiff must show an appropriation without consent, of the plaintiff's name, likeness, or identity, by the defendant for his own benefit. *Id.* at 762. South Carolina courts have held that the claim involves "infringement on the right to the commercial protection of one's name, likeness or identity" and "infringement on the right to *publicize* and profit from one's name, likeness, and other aspects of personal identity." *Wiser v. Rent-A-Center*, No. 08-02592; 10-80001, 2010 WL 5437241, at *7 (Bankr. D.S.C. June 21, 2010) (emphasis in original); *see also Sloan v. South Carolina Dept't of Pub. Safety*, 586 S.E.2d 108, 110 (S.C. 2003) (stating wrongful appropriation of personality concerns the plaintiff's right at common law to publicize and profit from his name, likeness, or identity). Appropriation of name or likeness actions are intend to protect "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." Restatement (Second) of Torts § 652C cmt. a.

There is no dispute that for several years now Conseco Life Insurance Company has been using Plaintiffs' IPM and FIC names on correspondence that states that Plaintiffs are the designated agent of Defendants, which is not true. Such a designation implies that Plaintiffs are available to assist policyholders with their policies, which is also not true. At least by the end of 2009, Defendants were on notice that they had no consent to continue to represent to policyholders that Plaintiffs were agents of Defendants. *See* Pls.' Resp. to Summ J., Exh. F, Letter from Attorney Harper & Exh. G, Harper Aff. As evidence that there is no genuine issue of fact as to whether Defendants benefited from the use of Plaintiffs' names, Defendants cite to the following testimony by Plaintiffs' expert Erik Bugge:

Q: How would [Conseco's continued practice of stating IPM as the agent on the policyholder statements] have benefited Conseco in any way?

A: I don't think – given no relationship between Conseco and Insurance Marketing, I don't think there is any benefit.

Erik Bugge Depo 151: 1-8.  Plaintiffs argue that this exchange was taken out of an all-day deposition and their expert would not have become involved had he not believed that the Defendants were extracting some benefit.  Plaintiffs cite to other testimony by Bugge wherein they argue he clearly alluded to the financial benefit to Defendants:

A: . . . And – and their systems have a writing agent in there is to be able to pay service commissions and – and renewal commissions and get it to the right person, because it links to their compensation system. And I'm guessing, by the – by the IMO being at the top of those annual statements, that he's still being listed, but they must have gone to the – must have gone to zeroing out, in the commission system environment, zero commissions. Because, I guarantee, it's probably still feeding the commission system, but they just changed his percentage from whatever it is, one or two percent, to zero.

Id. at 144:16-25 -145: 1-4.  Plaintiffs contend that there is a reasonable inference that because there is no benefit to Plaintiffs, as they are not licensed agents for Defendants anymore, then there would be a clear benefit to Defendants who profit on these policies that cannot be changed by Plaintiffs. Namely, because if a new agent were appointed, servicing these policies, he may

rewrite the policy or sell a different product and then Defendants would have to pay him commissions. On this point, Defendants' 30(b)(6) witness, Mr. Rikkers, testified:

Q: And the listing [IPM] on all those policies would also be essentially a free perk for Conseco?

Mr. Jason Walters: Object to form.

Q: Is that correct?

A: I'm not sure what benefit we are receiving from that, sir.

Q: Are you getting payment on the premiums?

A: That's besides [sic] the point. No, we're not paying him commission, but I still don't know that we're deriving any benefit from that.

Q: Okay.

A: Just, you know, the fact that his name appears on that statement.

Q: Is the revenue stream from those premiums being affected by having to pay commission to anyone else?

A: No, sir.

Q: Okay. Would that revenue stream not be as good if these policies were ever assigned to agents who might change the policies?

A: No, sir, it would be unaffected.

Q: If they changed they [sic] policy, if they altered these policies in any way, they still wouldn't get anything out of it?

A: They would get something out of it, but I'm not prepared from

an actuarial standpoint to tell you whether our profits would be

better on the servicing of a policy that we are not paying

commissions on, and a new product doesn't necessarily mean that

one's less profitable than another from an income standpoint or a

revenue stream. I'm not prepared to say that.

Q: Okay. But it doesn't mean that it wouldn't be either?

A: Valid point. Valid point. But it certainly could go either way.

Rikkers Depo 110:4-25; 111: 1-15.   Based on all the deposition testimony,[5] the Court finds that

there is a genuine dispute as to whether Defendants benefitted, and are still benefiting, from the

use of Plaintiffs' names. *See Pleaugh v. A.W. Chesterton Co.*, No. 2:11-63519, 2012 WL

2914252, at *1 (E.D. Pa. Apr. 27, 2012) ("[A] dispute is 'genuine' if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" (citing *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

Additionally, Defendants' arguments that Plaintiffs' claim fails as a matter of law

because the use of Plaintiffs' names was merely incidental or informational, fails.   The Court

cannot agree that the use of Plaintiffs' names was "only to reflect that Plaintiffs were being

copied on the correspondence." Defs.' Mot. Summ. J. at 13.   From the viewpoint of the

policyholders, the only logical conclusion to be drawn is that either IPM or FIC is the designated

---

[5] In making its determination, the Court did not consider and hereby strikes Mr. Bugge's
affidavit (supplied in response to Defendants' arguments made in its Motion for Summary
Judgment), in which Mr. Bugge alters his earlier deposition testimony, because the statements in
the affidavit materially and directly contradict Mr. Bugge's prior sworn statements. *See
Mandengue v. ADT Security Systems, Inc.*, No. ELH-09-3103, 2012 WL 892621, at *18 (D. Md.
Mar. 14, 2012) ("In order to avoid infringing upon the province of the fact finder, application of
the sham affidavit rule at the summary judgment stage must be carefully limited to situations
involving flat contradictions of material fact.").

agent for the policy. Feldman testified that some of these policyholders are close friends of his or individuals with whom he had an agent-client relationship.[6] Feldman Depo 102:15-25; 103:1-3. By continuing to represent that IPM or FIC is the agent for a policy, Defendants were able to continue to service these customers, possibly because of use of Plaintiffs' names. Thus, Defendants use of Plaintiffs' names may not have been merely incidental or informational, but intentionally used for the purpose of taking advantage of Plaintiffs' reputations or the value associated with their names. Notably, under the Agreement, Plaintiffs are unable to "service" these policies in the usual sense; therefore, if a policyholder was to contact Feldman, he would be unable to carry out typical agent duties, which would obviously be bad for business.[7] *See Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) (finding that the "right of publicity relate[s] to *commercial* damage to the business value of human identity") (emphasis and alterations in original). Although Mr. Rikkers testified that he believed Feldman could "advise" policyholders, he acknowledged that the point of being an appointed agent is "the ability to sell product for that company," and it is undisputed that Plaintiffs are not licensed to sell insurance for Defendants. FIC does not even exist anymore. Further, Defendants argument that the use of Plaintiffs' names was simply a result of their computer system setup is unavailing. Mr. Rikkers testified that removing Plaintiffs' names was not as "easy as flipping a switch." Rikkers Depo 32:12-25. However, the record shows that Defendants were aware of this issue

---

[6] Feldman also testified that this was the reason why Defendants received "change of address" request forms and why he requested that they continue to mail him the correspondence sent to those policyholders to whom he had personally (not his agents) sold the policy. Feldman Depo 67: 6-16; 68:1-4. He testified that Defendants were continuing to use his corporate names, so he at least wanted to have a record of it because he couldn't do anything with the policies. *Id.* at 67:17-25; 68:1-4; 112-5-10.

[7] Feldman also testified that Defendant Conseco Life Insurance Company is a B-rated company, and he would not even be associated with a B-rated company. Thus, he is being damaged because his professional name and IPM are being used by a B-rated company without his permission. Feldman Depo 82: 15-24.

possibly as far back as 2006, but at least by 2009, and have, to date, been allegedly unable to fix the problem in the system. Mr. Rikkers even acknowledged that "it's been awhile" now that Defendants have known of this issue. Rikkers Depo 84:20-25. Although it may be true that this use was the result of Defendants computer system, at least initially, the Court cannot find under these facts that the use of Plaintiffs' names was merely an incidental computer-related problem. By not fixing the computer system, Defendants are essentially using Plaintiffs as rogue agents instead of appointing a new agent, and Mr. Rikkers admitted that Defendants would have to pay a new agent commissions if the agent rewrote the policy or sold the policyholder a different product, as discussed above. Rikkers Depo 100:23-25-101:1-9; 102:10-25-103:1-12.

Lastly, as to Defendants' contention that a plaintiff must establish celebrity status in order to prevail, the Court does not agree and joins the majority view that noncelebrities, just as celebrities, have a right to sue and recover for the commercial use of his or her likeness. In *Gignilliat*, the South Carolina Supreme Court held that "South Carolina does recognize the tort of infringement on the right of publicity," which "is best defined as the 'inherent right of every human being to control the commercial use of his or her identity.'" *Gignilliat v. Gignilliat*, 684 S.E.2d 756, 759-60 (*citing* Thomas Phillip Boggess V, *Cause of Action for an Infringement of the Right of Publicity*, 31 *Causes of Action 2d* 121, 144 (2006). Significantly, nowhere in the Supreme Court's opinion does it mention celebrity status or indicate that such a status is a requirement to bring a tort claim. The Court finds that the more logical conclusion based on South Carolina's limited case law is that "every human" has a right to protect his or her own name or likeness in the commercial sense. Therefore, summary judgment is inappropriate for Plaintiffs' Misappropriation—Common law/Invasion of privacy claim.

1. **Release**

Defendants argue that Plaintiffs' claim is barred by release. In the Agreement, Plaintiffs agreed to release Defendants "from any and all claims . . . which Plaintiffs have ever had or may have against the [Defendants] from the beginning of time to the date of the execution of this Agreement." Agr. at 3(1). Plaintiffs do not dispute that they have released their claims for those actions constituting wrongful appropriation of personality in regards to correspondence sent before 2006. Instead, they contend that their cause of action stems from actions taken after 2006 and continuing to this very day; therefore, such continuing behavior constitutes new wrongful actions which were not covered by the Release. The Court agrees.

Under Indiana law, a release agreement is a contract by which a party's right to prosecute a cause of action against the other party to the contract is surrendered. *Zollman v. Geneva Leasing Assocs., Inc.,* 780 N.E.2d 387, 392 (Ind. Ct. App. 2002). Enforcing release agreements serves a vital public policy by facilitating the orderly settlement of disputes. *Indiana Bell Telephone Co., Inc. v. Mygrant*, 471 N.E.2d 660, 664 (Ind. 1984). As is true with other contracts, the interpretation of a release is determined by its terms, considered in light of all of the facts and circumstances. *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994). Absent ambiguity, the court is to look only to the plain language of the Release to ascertain the parties' intent. *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, No. 1:04–CV–477–TS, 2009 WL 1107796, at *6 (N.D. Ind. Apr. 24, 2009). The provisions of the Agreement clearly indicate that the parties intended to settle all disputes asserted in the lawsuit, and in doing so, Plaintiffs intended to discharge Defendants from any liability "related to any contractual agreements between [the parties]" or "arising out of or in any way related to any transaction between [the parties]." Agr. at 3-4(2). There can be no doubt that the Release applies to all of

Plaintiffs' claims that arose "from the beginning of time to the date of the execution of the Agreement." Agr. at 3(1). However, the Release does not include a release of Plaintiffs' rights and claims that may arise after the Agreement is signed. Further, there is evidence to support Plaintiffs' claim against Defendants with respect to Defendants' appropriation of Plaintiffs' names *after* the parties signed the Agreement. One of the purposes of the Agreement was to amicably and effectively end the parties' business relationship. Plaintiffs contend that they believed Defendants would cease all wrongful conduct associated with any business ties between them. It is difficult to conclude that it was the parties' intent to release Plaintiffs' misappropriation claim in this lawsuit because at the time of signing the Release, the parties were also agreeing to end their business relationship—Plaintiffs were no longer appointed agents of Defendants. The actions taken by Defendants that are at issue here did not arise out of any relationship between the parties because after 2006 no relationship existed. Instead, Defendants engaged in "new" conduct by allegedly using Plaintiffs' names for their own benefit after 2006 without Plaintiffs' consent. As such, the Court finds no merit in Defendants argument that Plaintiffs' claim accrued prior to 2006 and was released in the Agreement.

### 2. Statute of Limitations

In South Carolina, the statute of limitations for tort actions is three years. S.C. CODE ANN. § 15-3-530(5). Plaintiffs do not dispute Defendants' contention that they were aware of Defendants' actions before April 18, 2008. *See id.* (stating that the limitation period begins to run when a "person knew or by the exercise of reasonable diligence should have known that he had a

cause of action"). Instead, Plaintiffs argue that Defendants' actions constitute a continuing tort,[8] and therefore, the statute of limitations has not lapsed to bar their claim.

The continuing tort theory is a common law theory generally applicable in real property cases. *See Silvester v. Spring Valley Cnty. Club*, 543 S.E.2d 563, 566 (S.C. Ct. App. 2001) ("When the nuisance is continuing and the injury is abatable, the statute of limitations does not run merely from the original intrusion on the property.") (citations omitted). The South Carolina Supreme Court has refused to adopt the "continuing tort" doctrine in a medical malpractice claim governed by the South Carolina Tort Claims Act. *See Harrison v. Bevilacqua*, 580 S.E.2d 109 (S.C. 2003). It is unclear whether such a theory could be applied to the type of claim presented here—a common law tort, rooted in property rights. *See Gignilliat*, 684 S.E.2d at 760. ("We further hold the right to control the use of one's identity is a property right."; "[Plaintiff] is challenging [defendant's] assertion that it has the unfettered right to use the Gignilliat name without compensation, which is a distinguishable property right."); *see also Estate of Presley v. Russen*, 513 F. Supp. 1339 (D. N.J. 1981) (deciding the right of publicity is a property right). However, it is established that such a theory does not apply "where a discrete wrongful act causes alleged continuing injury, as opposed to a situation with ongoing wrongful conduct." *Holloway v. Lloyd*, No. 3:11-2581, 2012 WL 786327, at *3 (D.S.C. Feb. 12, 2012). Here, Plaintiffs have pointed to ongoing wrongful conduct by Defendants, specifically, conduct taken by them in 2009 and as recent as March 25, 2012. *See* Pls.' Opp. Response. Exh. L & Defs.'

---

[8] The continuing tort doctrine applies "'where any negligent or tortious act is of a continuing nature and produces injury in varying degrees over a period of time.' . . . Under this theory, the statute of limitation does not begin to run 'until such time as the continued tortious act producing injury is eliminated.'" *Harrison v. Bevilacqua*, 580 S.E.2d 109, 115 (S.C. 2003) (looking to Georgia law, as relied upon by petitioner, and denying petitioner's continuing tort doctrine argument in the context of medical malpractice (*quoting Mears v. Gulfstream Aerospace Corp.*, 484 S.E.2d 659, 664 (Ga. Ct. App. 1997))) (citations omitted).

Motion Summ. J., Exh. F.  Therefore, the Court finds that Defendants' allegedly wrongful conduct has occurred within the statutory limitations period; in fact, the conduct is still occurring to this very day and each day creates a separate cause of action.

## C.  PLAINTIFFS' PUNITIVE DAMAGES CLAIM

Defendants argue that because there is not clear and convincing evidence that they have acted reprehensibly or with intentional malice towards Plaintiffs, summary judgment is appropriate on Plaintiffs' punitive damages claim.  Defendants point out that Plaintiffs submitted change of address forms in 2008 and 2009, requesting that all annual statements be sent to their new address. Defendants also argue that the correspondence was not intentionally sent by individuals, but was generated by a computerized administrative system.  In order for a plaintiff to recover punitive damages, there must be evidence that a defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights. *Taylor v. Medenica*, 479 S.E.2d 35, 46 (S.C. 1996).  A conscious failure to exercise due care constitutes "willfulness," for purposes of awarding punitive damages. *Id.*  A plaintiff has the burden of proving punitive damages by clear and convincing evidence. S.C. Code Ann. § 15-33-135 (1976). "In South Carolina, 'punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future.'" *Gamble v. Stevenson*, 406 S.E.2d 350, 354 (S.C. 1991) (quoting *Laird v. Nationwide Ins. Co.*, 134 S.E.2d 206, 210 (S.C. 1964)).

The evidence cited by Plaintiffs indicates that Defendants (1) agreed, as memorialized in the Agreement, to cut business ties with Plaintiffs; (2) continued to represent that Plaintiffs were the designated agents on some of its policies; (3) received and ignored notice from Plaintiffs' counsel to cease using Plaintiffs' names; and (4) continued to use Plaintiffs' names—even to this

very day. Plaintiffs point out that despite Defendants' seemingly inability to remove their names from the computer system, Defendants had the ability to alter and update Plaintiffs' business address information. And, as noted above, Mr. Rikkers acknowledged that Defendants have been aware of this computer problem for a while, yet the problem still exists. Plaintiffs also cite to Mr. Rikkers' testimony admitting that the current revenue stream from the policies wherein Plaintiffs are listed as the agent would be affected if another agent were to change them:

> Q: If a policy holder, for example Michael Acerra, called in and asked for a new agent, would that agent be able to write him a new policy?
>
> A: If they were an active agent in good standing, yes.
>
> Q: And when he rewrote the policy, would he get paid compensation renewals, agent commissions from that?
>
> A: Yes
>
> Q: Okay, so as long as the policy isn't rewritten, Conseco doesn't have to pay any commissions on the policy, at least for the policies which list Insurance Products Marketing as agent; is that correct?
>
> A: I believe that that's accurate.

Rikkers Depo 101:20-25; 102: 1-5.

Both sides have submitted evidence in support of their respective positions on punitive damages. At this point, the Court cannot conclude as a matter of law that punitive damages are not appropriate. The evidence presents a genuine issue of fact as to whether Defendants' conduct was willful, wanton, or in reckless disregard of Plaintiffs' rights which requires its submission to a jury. It is undisputed that Defendants knew Plaintiffs objected to the use of their names, at least by the end of 2009, and Defendants do not contend (nor is there any evidence to support) that it believed the Agreement allowed them to use Plaintiffs' names. Under South Carolina case law,

the issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the Defendant's behavior was reckless, willful, or wanton. *Mishoe v. QHG of Lake City, Inc.,* 366 S.C. 195, 621 S.E.2d 363 (2005) (citing *Welch v. Epstein,* 342 S.C. 279, 536 S.E.2d 408, 419 (S.C. Ct. App. 2000)). Therefore, the Court finds that summary judgment is not appropriate as to punitive damages.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment is **DENIED** and Defendants' Motion to Strike is **GRANTED.**

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**August 13, 2012**
**Charleston, SC**